Seated. Ms. Perkins will call the next case. Pre-21-0567, City of Peoria v. Peoria Police Benevolent Association. Jeremy Langen, acting by Shane Goldman. Ms. Perkins, if you're ready, you may proceed. May it please the Court. Ms. Sue Perkins, on behalf of Appellant, the City of Peoria. Public policies are based on societal expectations. Police officers should not be racist. This is a well-defined and dominant public policy. Police officers who express racial animus should be terminated from employment. This is a well-defined and dominant public policy. Systemic issues in law enforcement in regards to racism continue to plague our society. Society, including Peorians, expect that officers that express racial animus be terminated from employment. The City, recognizing this expectation, terminated Jeremy Langen from employment after an internal investigation uncovered that he posted several racially charged messages and several racially insensitive photographs to Facebook, all targeted towards Peoria's black community. All while he held himself out to be an officer for the City of Peoria. Now, the Peoria Police Benevolent Association, knowing all of this, still filed a grievance on behalf of Jeremy Langen the very next day. The matter eventually proceeded to arbitration, and the ward found that the City could only impose a non-terminable penalty solely for disclosing investigative information on social media, and that Langen was to be reinstated to his position as a patrol officer with all back wages and benefits. In so many words, the ward stated that the City had to continue to employ what a reasonable person would consider to be a racially insensitive officer. Continue to employ an officer whose Facebook postings a reasonable Peorian would know to be racist. Continue to employ an officer who posts investigative information on social media. Then, put that officer back on the streets to patrol the minority-dense south end of Peoria, look the other way, and hope for the best. This was unacceptable and against public policy, so the City filed a timely review of the award in Circuit Court. An essential reason for the review was that the award violated public policy. The City of Peoria asked this Honorable Court to review the Circuit Court decision from November 5th of 2021, in which the Circuit Court denied the review of the award, and affirmed the award, finding that the arbitrator's award was within his authority. But more importantly, it stated that the award did not contravene public policy. The minimum standard of review is abuse of discretion, because no reasonable person would have taken the opinion that the Circuit Court did. Case law has established important principles to overturn an arbitrator's award under the public policy exception. In American Federation of State, County, and Municipal Employees, AFL-CIO v. Department of Central Management Services, an Illinois Supreme Court case from 1996, the two-part test is spelled out. First, the question to ask is whether there is a well-defined and dominant public policy. And second, if the answer is yes, this Court must determine whether the award, as reflected in the arbitrator's interpretation of the collective bargaining agreement, violated public policy. The first question, there is a well-defined and dominant public policy to terminate officers from employment who express racial animus towards the public. In order for there to be a more balanced justice system, there's a foundational requirement for police officers to not express racial animus towards the public. And when officers that enforce the laws express racial animus, society expects that termination is just. The City is asking this Court to recognize the public policy that has already been set throughout the United States. Look at Warren, Michigan, where a police officer was terminated for posting racial remarks on Facebook. This happened in June of 2021. Or in Kissimmee, Florida, where an officer was terminated after he posted several racial memes and slammed the Black Lives Matter movement. This happened in January of 2021. Or closer to... But weren't all of those specifically racial? I mean, I think the argument you're trying to make here is that these are... He's not using anything specifically racial in his posts. So, that being said, how is it that a determination can be made where he specifically says it's not a race issue, it's a crime issue? And frankly, some of what he says doesn't make much sense at all. The paragraph that starts about those in those communities, talking about there's no family base, thanks to family... All that, I mean, that's kind of a nonsense paragraph. And I just don't know how we get from, you know, even the things that you just mentioned, where there's specific racial slurs that are made, and there's specific racial animus to this, where it seems to be sort of a blanket statement about people that don't want to work, people that, kids that don't have dads, rather than a statement about one specific racial group. How do we get to racially motivated from that? Peoria has 27.86% currently, population-wise, identifying as black. In the south end of Peoria, it's 58.03%, so almost 60% at the time Lehman was terminated that identified as black. Lehman patrols the south end of Peoria, which is heavily minority-dense. Now, when looking at the statistics and the comments that Lehman made, it's clear that he was using those words to target the black community. When he said, those in those communities need to stop killing each other, he was pointing out the black community. When he said, stop stealing from everyone who's trying to help them, and stop using and selling drugs, he was targeting the black community. When he said, they have no family base, thanks to Planned Parenthood, his words were clear. He was talking about the black community. No guidance, since they have no fathers and no path, since schools accepted common core and discontinued all shop classes that teach skilled labor. It's clear. When you look at what he was talking about and where that conversation stemmed from, it was regarding grocery stores closing on the south end of Peoria. And when he was interacting with a citizen about that article that was posted, his words were targeting the black community. When he decided to proudly put his cover photo as him in a police t-shirt with the letters BDRT and underneath Baby Daddy Removal Team, he was not only commenting on a broken system, he was mocking a broken system. Questions of public policy are not up to the arbitrator. However, the circuit court that reviewed the award had the authority to establish what dominant public policies are already in society. And this court, reviewing the award, has that same authority by reversing the circuit court decision. At Chicago Firefighters, PPVA Local No. 2 v. City of Chicago stated, a First District case from 2001, questions of public policy are ultimately left of resolutions of the courts, not the arbitrator. Assuming that we have established a well-defined and dominant public policy, the next question to ask under American Federation of State, County, and Municipal Employees is whether the underlying award, as reflected in the arbitrator's interpretation of the collective bargaining agreement, violated public policy. Now, the arbitrator was presented with the collective bargaining agreement negotiated between the parties for decades. And despite having clear language before him, he came to an award that violated public policy. For example, Section 1.1 of the collective bargaining agreement reserves management rights to determine its mission's policies and set forth all standards of service offered to the public. Pursuant to Section 1.1 of the collective bargaining agreement, management created General Order 100.05 for commissioned personnel, entitled Rules and Regulations. Layman violated not multiple sections of 100.01, including General Order 100.01G, Conduct Towards the Public, which states officers shall conduct themselves towards the public in a civil and professional manner that denotes a professional service orientation that will foster public respect and cooperation. Or General Order 100.050, which states, in relevant part, that no officer shall divulge investigative information while holding himself out to be a representative of the department in such matters. And for the interest of time, I'm going to focus on General Order 100.05B, Conduct on Becoming an Officer, which states, no officer shall engage in conduct or activity on or off duty that tends to bring this department in disrepute or impairs its efficient and effective operations or efficiency of the department or the individual. The words Layman used during the Facebook exchange with a citizen showed his racial animus towards the black community. When he made his cover photo on Facebook, a photo of him wearing the t-shirt BDRT, he was not just commenting on a broken system. He wasn't just commenting on a broken system. He was mocking the broken system. Now, efficient and effective policing relies on public trust. When mistrust makes ways through a community, it hinders the ability of police to do their jobs. The words Layman used brought disrepute on the Peoria Police Department. So much so that a prevalent leader of the black community approached the then police chief about Layman's posts. So much so that a local Peoria Facebook group, the Black Justice Project, reposted Layman's Facebook exchange with the citizen and commented, if we don't speak up, if we don't speak out, if we do not set the standard, these types of officers will continue to patrol our neighborhood. Now, despite the arbitrator being presented with a complete award and a complete record, he still came to an award that violated public policy. Now, the arbitrator ignored the effect on the city to keep Layman employed, including distrust with the citizens of Peoria, disrepute to the city's police department, and Layman himself as a police officer. While the arbitrator pretended to acknowledge Layman's responsibilities and duties as a patrol officer who patrolled the south end of Peoria, he disregarded Peoria's demographics as a whole, including how 58.03% of Peoria's south end residents identify as black. The same area that Layman patrolled. Instead, the arbitrator said that the city retaliated by firing Layman because of what people thought and not what they actually said. Now, Layman said for the message to be clear to every Peorian, the words he used were clear. When he stated how he felt about those communities, he was showing his animosity towards the black community. When he proudly posted a t-shirt with the words police on it and baby daddy removal team, he was mocking the broken system. Just like the Peorian group, the Black Justice Project pointed out, the city enforced this court to set the standard by reversing the circuit court decision. There is a well-defined and dominant public policy. Governmental bodies should be able to terminate officers that show racial animus. Thank you, Ms. Perkins. You will have five minutes to rebuttal. Mr. Boyles, you may proceed. Thank you. May it please the court. The city presented two bases for its argument that the award should be overturned. The first argument it presented in its briefs and what it spent the majority of its time on was that the arbitrator exceeded its authority, allegedly, and that secondarily they argued that the award was in violation of public policy. I want to turn to the second claimed error about public policy because the city spent all of its time on that issue this morning. The award does not violate public policy. The city alleges that the arbitrator violated public policy because in the city's view, Officer Lehman is racially biased and insensitive. There are at least four problems with the city's argument. Legally, the city made up a public policy statement instead of pointing to a well-defined statement of public policy. So it failed to meet the public policy analysis set forth by the Supreme Court in the Misko case. I think it's a paperworker's case. And that should have been adopted by the Illinois Supreme Court in the 1988 Axman case that's in the briefs. In addition to doing that in their briefs and in the trial court, the city opened its arguments this morning with three to four more vague descriptions of public policy. And it asked the court this morning to recognize a public policy, basically to craft a public policy. That's not the standard. The standard is they have to point to something already in place. And the city never did that in its briefs to this court or in the trial court below. So legally, there's a problem with their public policy argument. Secondarily, even if the city did point to a public policy statement and a law, constitution, statutes, law, cases, and then ordinances and that sort of thing, even if they had done that, the First Amendment would predominate. So they haven't pointed to a clear statement of public policy and they haven't pointed to a dominant statement of public policy. So that's another legal problem with the public policy argument. Thirdly, they argue in their briefs and sort of mentioned it this morning that there's a public policy that requires police officers to be racially sensitive, which it may be that with police reforms, that's where policing is going. But as we sit to this day, I'm confident that police reports in Peoria, Ottawa, elsewhere, written today, will start off with describing where the officer is located, how he responded to the call, and then they'll identify the first person they meet as either W slash F for white female or W slash M for white male. Police reports and dispatchers still to this day will identify people by race and some people will take offense to that. And I get that, but that's not how policing works, especially because decisions have to be made quickly and on the spot, and that's not what this case involves. But the idea that there's a public policy that requires police officers to always be racially sensitive, that's not proven, and in fact, that's not the case. Factually, as the court pointed out this morning, the city did not prove at arbitration that Officer Lamey was racist or that he made racist statements. The arbitrator's finding on that issue is set forth in the defendant's brief, the police brief, and so there's not a factual basis. They had the opportunity to present those facts, convince the arbitrator they failed. It is the arbitrator's view of the facts that are accepted under that Misko Supreme Court case. And any one of those reasons is sufficient basis to not uphold or not grant the city's public policy appeal. The city also claims under the public policy aspect of its argument that the arbitrator committed, excuse me, the arbitrator created a public policy that said it was okay for police officers to divulge investigative information. That's just not true. The arbitrator never said that was okay. Officer Lamey admitted that was a problem, and that was admitted at the arbitration. And of course, the award ends with the arbitrator explaining that Officer Lamey should be punished for that, but should not be terminated for it. It was a question of degree, so there's the idea that the arbitrator created a public policy and saying it's okay for police officers to divulge that information. There's no factual basis for it. So for all those reasons, the city's public policy argument should fail. Now, with respect to its allegations that it exceeded authority, I believe they raised four separate issues that the arbitrator exceeded his authority. The first argument they raised, the one they spend most of the time on in their brief, was that they said the arbitrator created a First Amendment issue, but then he didn't decide it. So the city sort of disproved that allegation on its own. Curiously, the city also said the arbitrator had no authority to judge the credibility of the internal affairs investigative report. That's odd because that was city exhibit number two at the arbitration. That basically is an argument that the arbitrator had no authority to judge on the credibility of witnesses or evidence, which can't be true. Interestingly, that report on page 13, which is in the record at C-201, I think there's an enumerated paragraph number two towards the bottom, Lieutenant Wetzel, Lieutenant Shawn Wetzel, who was the internal affairs, at the time was in charge of professional standards at the Peoria Police Department, did not apply the social media policy to Officer Lehman because he found it was a draft policy and therefore not enacted. It did not sustain that finding. I raise that issue because the city asked this court to find that the arbitrator could not disagree with the internal affairs report, but at the same time, it's asking the court to disagree with the internal affairs report because the city itself didn't sustain that allegation. The last two claims the city makes about exceeding authority were that the arbitrator didn't take into account any usages of the trade, which the city never proved any usages of the trade at the arbitration, and that the city sort of got into this this morning, that the arbitrator did not consider the collective bargaining agreement or city policy. First of all, I didn't mention this in the brief, but first of all, the statute explains Section 15B of the Illinois Public Labor Relations Act, ICS 315-15B, explains that things like city policies and city ordinances yield to the collective bargaining agreement in the first place. And on top of that, the arbitrator quoted all of the relevant, either quoted or cited all of the relevant collective bargaining agreement provisions and city rule provisions in his award. So there's no factual basis to claim that he ignored them. He obviously knew what they were, either cited to them or quoted them, and maybe even discussed them in his award. So there's a presumption that the arbitrator did not exceed his authority legally, the city did not prove that the arbitrator exceeded his authority, and the city also did not demonstrate that the award violates public policy. I know that the city's policy about social media was just draft, but does the collective bargaining agreement cover any issues regarding, you know, doing any other witness at one time, but now because it's become so prevalent, is there anything in the collective bargaining agreement about, you know, someone having images posted of themselves or something? Because I know that there's not always instances where you, you know, it could be somebody else posting something. Is there anything in those agreements about, you know, the effect of social media? I don't recall it, and I'm pretty confident that it's not in there because Lieutenant Wetzel would have caught it. He's pretty thorough. So I'll say no, because I'm pretty confident on that one. There's a slight chance it might be in there. The Purity contract is actually one of probably the densest contracts that I deal with. It's 40 to 50 pages single-spaced, whereas several of them, you know, like the one here in Ottawa, it's probably 30 pages double-spaced. But a lot of it has came into effect over time, and it's not always quick to catch up to where things are. You know, you find a lot of artifacts in there, like officers hired before 1970-something or 1980-something. So I'm pretty confident it's not in there, and I'm very confident that Lieutenant Wetzel would have found it if it was. Thank you. Thank you very much. Thank you, Mr. Willis. Any other questions? No? Ms. Perkins from Utah. Thank you. Public policies are set by societal expectations. This panel will find it hard to find black-letter law that spells out that officers should not hold racial animus. The city doesn't dispute this. However, this panel does have the authority to establish what is already known in society. Mr. Boyles pointed out that the First Amendment was an issue that was addressed in the brief. He's correct. Before arbitration, the Peoria Police Benevolent Association brought this issue in federal court, but the federal court denied hearing on the issue. The city mentioned it in its brief to its arbitrator at length, pointing out that layman's First Amendment rights were not violated, but the arbitrator ignored this and didn't address the issue. This isn't a matter about reports being offensive because they identify someone's race. It's about the fact that an officer used words that were targeted towards Peoria's black community. Governmental bodies should have the ability to terminate officers that show racial animus. An arbitrator that decides, on behalf of Peoria, what types of officers should be able to patrol its people to serve and protect its people should be set aside based on public policy. Peoria should have been able to terminate Jeremy Layman for showing his racial animosity towards the black community. Thank you. Thank you. Any questions? Thank you, Ms. Perkins. Thank you both for your arguments here today. This matter will be taken under advisement, and a written decision will be issued to you as soon as possible. With that, we'll take recess until 12.